UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | | |
|---|---|---|
| SARAH K., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:21-cv-1290-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM DECISION |
| | § | AND ORDER |
| Defendant. | § | |

## <u>INTRODUCTION</u>

Plaintiff Sarah K. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied her application for Disability Insurance Benefits ("DIB") under Title II of the Act, and her application for supplemental security income ("SSI") under Title XVI of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 13).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 6, 7. Plaintiff also filed a reply brief. *See* ECF No. 9. For the reasons set forth below, Plaintiff's motion (ECF No. 6) is **DENIED**, and the Commissioner's motion (ECF No. 7) is **GRANTED**.

## <u>BACKGROUND</u>

Plaintiff protectively filed an application for DIB on January 8, 2014, and an application for SSI on June 20, 2016. Transcript ("Tr.") 198-199, 327-333. In both applications, Plaintiff alleged disability beginning May 13, 2002 (the disability onset date), due to back and bilateral knee impairments and acute severe depression. Transcript ("Tr.") 198-199, 327-333, 363, 379.

Plaintiff's claims were initially denied on May 20, 2014 (Tr. 118-121), after which she requested an administrative hearing (Tr. 122-123).

On June 2, 2016, Administrative Law Judge Brian LeCours ("ALJ LeCours") conducted a hearing in Albany, New York, at which Plaintiff appeared and testified. Tr. 24. Plaintiff was represented at the hearing by Stephen Brooks, an attorney. *Id*. Salvatore Garozzo, an impartial vocational expert, also appeared and testified at the hearing. *Id*. On August 1, 2016, ALJ LeCours issued an unfavorable decision, finding Plaintiff not disabled and denying both applications. Tr. 21-40.

After the Appeals Council denied Plaintiff's request for review on December 5, 2017, ALJ LeCours' decision became the final determination of the Commissioner. Tr. 1-6. Thereafter, on February 8, 2018, Plaintiff filed a lawsuit in the United States District Court for the Western District of New York. *See* Case No. 18-cv-00213-FPG.

On June 13, 2018, Plaintiff filed a subsequent claim for Title XVI benefits, alleging disability since June 13, 2018. *See* ECF No. 6-2 at 4. On November 1, 2019, Administrative Law Judge Sharda Singh ("ALJ Singh") conducted a video hearing, and on December 9, 2019, issued a fully favorable decision finding Plaintiff disabled as of her application date of June 13, 2018. *See id*. at 4, 7.

On March 23, 2020, this Court remanded Plaintiff's current claim for further proceedings, finding that the Appeals Council improperly declined to consider new evidence first submitted to it on appeal.[1] Tr. 1974-80. Thereafter, on April 29, 2021, the Appeals Council vacated the Commissioner's final decision and remanded Plaintiff's case to an administrative law judge for

---

[1] On December 28, 2016, less than five months after ALJ LeCours issued his decision, treating psychologist Jennifer A. Fendya, Ph.D. ("Dr. Fendya") completed a Mental Impairment Questionnaire on Plaintiff's behalf. *See* Tr. 1977. Plaintiff requested that the Appeals Council remand the matter to consider this new evidence. *See id*. However, the Appeals Council denied the request because it found that the "additional evidence [did] not relate to the period at issue." *See id*.

further proceedings consistent with the Court's order. Tr. 1986-90. The Appeals Council neither affirmed nor reopened the subsequent claim, noting that: "Unless the decision is reopened and revised in accordance with applicable regulations, the period before the Administrative Law Judge will be limited to that period prior to June 13, 2018." Tr. 1988.

On October 4, 2021, Administrative Law Judge Stephan Bell ("ALJ Bell"), conducted an online video hearing,[2] at which Plaintiff appeared and testified and was represented by Lewis Schwartz, an attorney. Tr. 1868, 1890-1933. Salvatore Garozzo, an impartial vocational expert, also appeared and testified, as did Plaintiff's treating psychologist, Jennifer A. Fendya, Ph.D. ("Dr. Fendya"). Tr. 1868. Regarding the subsequent favorable decision finding Plaintiff disabled as of June 13, 2018, ALJ Bell indicated that she found no basis to reopen that decision. Tr. 1868. Accordingly, ALJ Bell determined that the period at issue in the current case is from May 13, 2002, the alleged onset date, through June 12, 2018, the date preceding the day she was found disabled pursuant to the subsequent-filed application. *Id.* On October 15, 2021, ALJ Bell issued an unfavorable decision, finding that that Plaintiff was not disabled from May 13, 2002, through June 12, 2018. Tr. 1865-82. Plaintiff filed the present lawsuit on December 20, 2021.

## LEGAL STANDARD

### I.   District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more

---

[2] Due to the extraordinary circumstance presented by the Coronavirus Disease 2019 ("COVID-19") pandemic, all participants attended the hearing by online video hearing. Tr. 1868.

than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

## II.   The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f).

If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

ALJ Bell analyzed Plaintiff's claim for benefits under the process described above and made the following findings in her October 15, 2021 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant did not engage in substantial gainful activity during the relevant period (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant had the following severe impairments during the relevant period: depressive disorder, not otherwise specified, chronic pain syndrome, and recurrent left knee subluxation and dislocation status post multiple surgical procedures (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. During the relevant period, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a),[3] including lifting and carrying ten pounds occasionally and less than ten pounds frequently, sitting for up to a total of six hours, standing for up to a total of two hours, and walking for up to a total of two hours, and pushing/pulling as much as she could lift/carry, except the claimant could: climb ramps and stairs occasionally; never climb ladders, ropes or scaffolds; occasionally

---

[3] "Sedentary" work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met.

balance, stoop, kneel, crouch, and crawl; never work in vibration; perform simple, routine and repetitive tasks; and make simple work-related decisions.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on February 16, 1978, and was 24 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date and she remained a younger individual age 18-44 throughout the relevant period (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity during the relevant period, there were jobs that exist in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant was not under a disability, as defined in the Social Security Act, from May 13, 2002, the alleged onset date, through June 12, 2018, the day preceding the day she was found to be disabled pursuant to a subsequent application (20 CFR 404.1520(g) and 416.920(g)).

Tr. 1868-81.

Accordingly, ALJ Bell determined that, based on the application for a period of disability and disability insurance benefits protectively filed on September 30, 2013, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act through the relevant period of May 13, 2002, through June 12, 2018. Tr. 1881. ALJ Bell also determined that based on the application for supplemental security income protectively filed on June 6, 2016, the claimant is not disabled under section 1614(a)(3)(A) of the Act through the relevant period of May 13, 2002, through June 12, 2018. Tr. 1882.

## **ANALYSIS**

Plaintiff asserts five points of error. First, Plaintiff argues that ALJ Bell failed to provide good reasons for discounting the opinion of treating psychologist Dr. Fendya. *See* ECF No. 6-1 at 1, 14-20. Second, Plaintiff argues that ALJ Bell improperly substituted her own medical judgment

over that of any physician. *See id*. at 1, 20-21. Third, Plaintiff argues that ALJ Bell erred in not complying with the requirements of SSR 18-1p in determining the onset date of Plaintiff's disability. *See id*. at 1, 21-23. Fourth, Plaintiff argues that ALJ Bell failed to properly weigh the medical opinions of Melvin Brothman, M.D. ("Dr. Brothman"), and Michael Miller, M.D. ("Dr. Miller"), each of whom conducted an Independent Medical Examination ("IME") for Plaintiff's workers' compensation claim. *See id*. at 1, 23-26. Finally, Plaintiff argues that ALJ Bell failed to consider Plaintiff's use of a cane under SSR 96-9P. *See id*. at 1, 27-28. Plaintiff also asserts that, based on the number of years that have elapsed since Plaintiff applied for benefits, remand for calculation of benefits is the appropriate remedy in this case. *See id*. at 28-29.

In response, the Commissioner argues that: (1) ALJ Bell properly evaluated Dr. Fendya's treating source opinions and gave good reasons for the weights assigned (*see* ECF No. 7-1 at 7-14); (2) ALJ Bell's RFC finding was supported by substantial evidence, including the objective medical and the opinion evidence; (3) SSR 18-1p is inapplicable to Plaintiff's Case (*see id*. at 23-25); (4) ALJ Bell properly weighed the opinions of Dr. Brothman and Dr. Miller (*see id*. at 14-22); and (5) Plaintiff failed to show that a cane was medically required (*see id*. at 22-23). The Commissioner also objects to Plaintiff's assertion that she is entitled to an award of benefits based on the number of years that have elapsed since she applied for benefits. *See id*. at 26.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Upon review of the record in this case, the Court finds that ALJ Bell thoroughly considered the evidence of record, including the objective medical and opinion evidence of record, as well as Plaintiff's ability to engage in extensive activities of daily living, and reasonably concluded that Plaintiff could perform sedentary work with additional exertional and non-exertional limitations. Furthermore, ALJ Bell gave good reasons for the weights assigned to the medical opinions, including Dr. Fendya's treating source opinions as well as the opinions of Drs. Brothman and Miller, and the ALJ's findings were supported by substantial evidence. Accordingly, the Court finds no error.

The record reflects that Plaintiff suffered a work-related injury on May 13, 2002, when she fell through a floor vent while working at Terrapin Station and dislocated her left kneecap. Tr. 479. However, the record also reflects that Plaintiff had long a history of knee problems pre-dating that injury. Tr. 479, 648. She had three left knee surgeries before her on-the-job injury and two surgeries afterward (Tr. 479), and she had a total of eight surgeries on her left knee and one on her right knee (Tr. 648).

Plaintiff started treatment for her left knee in 2000 with orthopedist Robert Smolinski, M.D. ("Dr. Smolinski") (Tr. 370) and continued treating with him through at least 2008 (Tr. 1215–1383). On June 26, 2002, Plaintiff was seen for recurrent dislocation of the patella. Tr. 1290. Plaintiff was working as a salesclerk, but she was unable to work more than 3.5 hours per day. *Id*. Dr. Smolinksi prescribed "continued physical therapy" and Darvocet sporadically for pain. *Id*. He indicated that Plaintiff should be considered for "possible arthroscopic evaluation with arthroscopic evaluation with lateral release, medial reefing and repeat medialization of her tibial tubercle." *Id*. At a follow-up visit on July 23, 2002, Dr. Smolinski noted no improvement, and Plaintiff elected to proceed with surgery. Tr. 1291.

On September 24, 2002, Plaintiff continued to complain of "giving way in the patellofemoral region," and reported she was unable to work as a salesclerk because of her knee pain. Tr. 1293. Examination showed positive apprehension; patellar subluxation into the 3rd and 4th quadrant laterally; moderate patellofemoral crepitus with mild compression pain; and mild tenderness ·over her medial joint line and no effusion. *Id*. There was also some mild quadriceps weakness, and Dr. Smolinski noted that Plaintiff walked with the use of a cane.  *Id*. Risks of the planned diagnostic arthroscopy were explained, and Dr. Smolinski noted that Plaintiff "may end up with recurrent dislocation of her patella laterally or possible medial dislocation, and possible increased patellofemoral symptoms secondary to pain." *Id*.

On September 30, 2002, Dr. Smolinski performed arthroscopic surgery on Plaintiff's left knee. Tr. 410-12, 1323-25. At her post-operative follow-up visit on October 8, 2002, Dr. Smolinski noted that Plaintiff's patella did subluxate into the 3rd and 4th quadrant laterally with a near complete dislocation on lateral stress. Tr. 1326. Examination showed mild effusion of the left knee; her wound was clean and dry; and she had no erythema or warmth. *Id*. Plaintiff was to begin a physical therapy program with minimal weightbearing for three weeks, then progressive weightbearing as tolerated. *Id*.

On November 27, 2002, Dr. Smolinski noted that Plaintiff was "doing fairly well." Tr. 1288. She had not experienced any recurrent dislocations, but she had experienced some buckling episodes which Dr. Smolinski stated should diminish as Plaintiff got stronger. *Id*. Plaintiff was to continue physical therapy and return in six weeks. *Id*.

On January 6, 2003, Dr. Brothman conducted an IME in conjunction with Plaintiff's workers' compensation claim. Tr. 1284-87. Dr. Brothman noted that Plaintiff used a cane when she entered the building and had a definite limp on her right side. Tr. 1285. She was unable to perform a full squat; her range of motion was from zero degrees to 110 degrees; and there was no

evidence of crepitation and "no real tenderness on patellar compression." *Id*. Dr. Brothman observed that Plaintiff's patella was stable, although somewhat hypermobile, and muscle atrophy was noted in the left thigh. *Id*. Dr. Brothman assessed recurrent dislocation left patella following new trauma" and "status post tibial tubercle transfer with quadriceps atrophy post op." *Id*. He opined that Plaintiff "could go to work but must have a sitting job." *Id*.

When reexamined in April 2004, Plaintiff continued to exhibit a limping gait and complained of an inability to squat. 1233. However, range of motion was full, and she displayed some tenderness to patellar compression and some crepitus, but there was no ligamentous instability. Tr. 1234.

On May 21, 2003, Plaintiff reported one dislocation since her surgery, which had occurred "when she was in an awkward position changing a light fixture." Tr. 1271. Plaintiff complained of "symptomatic retained hardware" and Dr. Smolinski planned to remove the left knee tibial screws. *Id*. Thereafter, Plaintiff was to continue physical therapy with possible medial reefing in the future. *Id*. On June 9, 2003, Dr. Smolinski performed surgery to remove the retained hardware. Tr. 413-15.

On October 3, 2003, Plaintiff complained of "marked pain" after returning to work, which had started 24 hours after she worked a four-hour shift. Tr. 1256. She also reported "a few episodes of the patella subluxating but no disclocations." *Id*. On December 10, 2003, she continued to complain of subluxation episodes. Tr. 1253. Dr. Smolinski recommended a more rigid patellofemoral brace, and Plaintiff was to continue with physical therapy. *Id*.

Plaintiff had a follow-up visit with Dr. Smolinski on January 14, 2004, complaining that her left knee continued to bother her with aching, and she was unable to work. Tr. 1238. She reported that her knee "popp[ed] out" a few weeks ago getting out of a car; she slipped and twisted her knee while not wearing her brace. *Id*. Dr. Smolinski noted that her knee had not popped out

recently while she was wearing her brace. *Id*. He recommended "continued aggressive strengthening" and urged Plaintiff to wear her knee brace more often to prevent further injuries. Tr. 1239.

On March 16, 2004, Plaintiff reported that she dislocated her left knee in late January while wearing her brace and now complained of persistent pain. Tr. 1236. Dr. Smolinski noted significant depression that was worsening because her knee continued to bother her. *Id*. He requested authorization from the workers' compensation carrier to perform left knee arthroscopy with open medial retinacular repair or reconstruction and opined that Plaintiff could only work in a "basic sedentary type occupation." Tr. 1237.

On August 31, 2004, Dr. Smolinski noted that the requested surgical authorization had previously been denied by the workers' compensation carrier. Tr. 1230. He also noted that a second opinion from Dr. Brothman had been obtained, and Dr. Brothman agreed that the surgery was indicated, apportioning it 50% to a pre-existing condition and 50% to the work-related injury. *Id*.

On November 18, 2004, Plaintiff was seen by pain management specialist Gerald L. Peer, M.D. ("Dr. Peer").  Tr. 1228-29. She reported that her pain was "always present," and the pain was aggravated by climbing stairs, standing, and walking. Tr. 1228. Her pain was "moderately alleviated" by pain medication. *Id*. Plaintiff was also using a TENS (transcutaneous electrical nerve stimulation) unit on the left knee, which she reported reduced her symptoms by 50 percent. *Id*. Upon examination, Dr. Peer noted that Plaintiff exhibited a markedly antalgic gait; strength in the lower extremities was 5/5 bilaterally; and sensation and reflexes were intact. *Id*. Dr. Peer opined that Plaintiff's knee pain was 50% work related, and "she ha[d] a moderate and partial disability from all work (temporary)." Tr. 1229.

On March 7, 2005, Dr. Smolinski performed a left knee medial retinacular advancement with proximal realignment surgery. Tr. 1223. At a follow-up visit one week later, Dr. Smolinski

noted that Plaintiff was "doing fairly well," though she continued to be "somewhat loose," and was "not showing significant signs of scarring." Tr. 1222. He also noted that Plaintiff "may be at high risk for recurrent dislocations laterally with possible medial dislocations." *Id*.

On July 11, 2006, Dr. Smolinski noted that "Plaintiff ha[d] semi-plateaued," and although the left knee continued to feel unstable, "if she wears her brace, she does not have any further subluxations." Tr. 1383. On examination, Dr. Smolinski noted that Plaintiff's gait was "basically normal." *Id*. He also noted that the left knee was clinically stable with full range of motion slight hyperextension and patellar subluxation in the 3rd quadrant medially and laterally; she had no effusion and minimal tenderness; mild apprehension, mildly diminished strength, and some mid quadriceps atrophy. *Id*. The right knee was normal for range of motion, strength, stability, with some hyperextension and no tenderness or effusion. *Id*. Dr. Smolinski suggested holding off on further surgery and referred Plaintiff to pain management. Tr. 1383-84.

On November 2, 2006, Dr. Smolinski noted that Plaintiff still complained of "a feeling of giving way" in her left knee and had considerable pain. Tr. 1207. He noted that Plaintiff was presently working after returning to work on October 27, 2006. On examination, Dr. Smolinski noted considerable quadriceps atrophy. *Id*. He felt that Plaintiff would benefit from quadriceps exercise but noted "she has been unable to do that." *Id*. He also noted that further surgical treatment, such as another medial retinacular reconstruction, may be necessary, but in the meantime, Plaintiff opted to receive another injection. *Id*. On March 29, 2007, he returned Plaintiff to light duty work. Tr. 1205.

Orthopedic surgeon Dr. Miller conducted an IME on May 27, 2008 (Tr. 1152-55), and on February 11, 2009 (Tr.1146-48). In May 2008, Dr. Miller noted that Plaintiff was working 16 hours per week, attending college, and working as a full-time caregiver to her parents. Tr. 1140. On both occasions, Dr. Miller observed that Plaintiff ambulated with a normal gait. Tr. 1147, 1153.

Motion in the left knee ranged from zero degrees to 140 degrees and the patella tracked laterally. *Id*. There was no evidence of dislocation or subluxation on range of motion. *Id*. Pain was reported on patellofemoral grind testing and apprehension testing was positive, but her ligaments were stable, and she displayed no thigh atrophy. Tr. 1147. Anterior and drawer signs were negative. *Id*. In May 2008, Dr. Miller recommended six weeks of physical therapy and determined that Plaintiff was able to return to full-time work with a lifting restriction of 15 to 25 pounds. Tr. 1154. In February 2009, he opined that Plaintiff had attained maximum medical improvement from physical therapy and recommended she continue to undergo pain management treatment. Tr. 1146, 1154.

On August 28, 2008, Dr. Smolinski released Plaintiff to return to work on September 15, 2008, but she was "limited to four hours per day in retail." Tr. 1158. On March 12, 2009, Dr. Smolinski noted that Plaintiff continued to complain of left knee pain, but she "ha[d] not been having episodes of instability recently." Tr. 1132. He requested authorization for a TENS unit and opined that she would "most likely not be able get back to anything more than just a sedentary type of occupation." *Id*.

Plaintiff had a follow-up visit with Dr. Peer on June 17. 2009, and reported that she obtained significant relief with the use of the TENS unit, and her pain was relieved by approximately 66 percent. Tr. 1123. In November 2009, Dr. Peer opined that Plaintiff was able to return to work with limitations. Tr. 1108.

Plaintiff was re-examined by Dr. Peer on January 22, 2013, Tr. 479-80. Plaintiff reported that her TENS unit was providing 66% pain relief, but she was no longer using it because her insurance carrier would not cover the electrode patches. Tr. 479. Dr. Peer noted that Plaintiff was "limited in ambulation'" *Id*.  She could walk about a mile; she was unable to kneel or squat; and she could not stand only on her left leg. *Id*.  She could stand about 45 minutes, after which she must sit and apply ice. *Id*.  Cortisone shots and bracing had helped her left knee, and "[i]n the

absence of Darvocet, she [was] using hydrocodone, usually about two a day." *Id*. Plaintiff reported she had finished post-graduate courses in glassmaking at Corning Glass Museum. *Id*.; *see also* Tr. 857. On examination, Dr. Peer observed marked tenderness over the left patella, and administered a left sub patellar injection. Tr. 480. Plaintiff reported recent cannabis use, and Dr. Peer warned her that this could result in her being restricted from further prescriptions of controlled analgesics. *Id*.

On February 20, 2013, Plaintiff returned to Dr. Peer requesting repeat administration of trigger point objections, which had been helpful in the past. Tr. 484. On examination, Plaintiff walked with a normal gait. *Id*. In August 2013, Dr. Peer observed that Plaintiff's gait was normal; straight leg raise testing was 90 degrees with no pain bilaterally; and heel toe walk was normal. Tr. 505. In May 2014, Dr. Peer noted that Plaintiff walked with a normal gait; displayed 5/5 strength bilaterally; and heel toe walk was normal. Tr. 556. When seen by Dr. Peer in April 2016, Plaintiff reported no changes. Tr. 679. Her gait remained normal, as were strength, sensation and reflexes in the lower extremities. *Id*.

The record reflects that Plaintiff began treatment with psychologist Dr. Fendya in August of 2002. Tr. 1259. Dr. Fendya opined that Plaintiff's mental health symptoms were the direct result of her physical injury. *See, e.g.*, Tr. 1259, 1493-94, 1482, 1394. On May 27, 2016, Dr. Fendya additionally opined that "extremely stressful losses/life events, as well as her experience of chronic pain . . . exacerbated [Plaintiff's] symptoms of depression and anxiety mental health symptoms, for which she [was] in ongoing therapy." Tr. 857.

On December 28, 2016, Dr. Fendya completed a Mental Impairment Questionnaire in support of Plaintiff's claim.[4] Tr. 10-15; *see also* Tr. 2115-20. Dr. Fendya indicated diagnoses of

---

[4] The Court notes that this questionnaire is the new evidence that the Court found warranted remand after the Appeals Council declined to consider it. *See* Tr 1879.

major depression, moderate, recurrent, generalized anxiety disorder, and panic disorder without agoraphobia. Tr. 10. While noting difficulty separating out Plaintiff's emotional and physical limitations and commenting that her pain and mental impairments feed off each other, Dr. Fendya opined that Plaintiff's mental abilities were unlimited or very good in the majority of areas of work-related mental activity considered, except that she opined that Plaintiff was unable to meet competitive standards in completing a normal workday or workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.. Tr. 12-13. She also opined marked limitations in maintaining social functioning. Tr. 13. She estimated that Plaintiff would miss on average of three to four days of work per month due to her mental condition or its treatment. Tr. 15.

On October 4, 2021, Dr. Fendya testified at Plaintiff's administrative hearing. Tr. 1895-1916. She testified that Plaintiff had listing-level mental impairments (Listings 12.04 and 12.06) by virtue of social functioning that is markedly limited, at least at times, as well as a marked limitation in the ability to adapt or manage herself. Tr. 1897-99. Dr. Fendya explained that although Plaintiff worked at times during the relevant period, "there was no consistency in her ability to do that," because Plaintiff needed to "budget" her mental, emotional, and physical ability to perform a particular activity and engaging in any activity that was going to "cost [her] mentally, emotionally, and pain-wise" would require recovery time. Tr. 1900-01. Dr. Fendya further testified that "given the mental, emotional and physical limitation all combined it's difficult for [Plaintiff] to even do unskilled work in any sustained way" (Tr. 1904); she would likely miss three to four days of work per month due to increased symptoms and/or recovery time from working(Tr. 1904-1905); and she would be off-task more than 50 percent of the time because she spends most of time on her bed resting (Tr. 1905-1906). Finally, Dr. Fendya testified that since May 13, 2002, Plaintiff was unable to work full-time in any capacity. Tr. 1909, 1911.

As noted above, Plaintiff argues (among other things) that the RFC finding was not supported by substantial evidence because ALJ Bell did not properly evaluate the opinion evidence. *See* ECF No. 6-1 at 14-26. A claimant's RFC is the most she can still do despite her limitations and is assessed based on an evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); Social Security Ruling ("SSR") 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Additionally, it is within the ALJ's discretion to resolve genuine conflicts in the evidence. *See Veino v Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). In so doing, the ALJ may "choose between properly submitted medical opinions." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Moreover, an ALJ is free to reject portions of medical-opinion evidence not supported by objective evidence of record, while accepting those portions supported by the record. *See Veino*, 312 F.3d at 588. Indeed, an ALJ may formulate an RFC absent any medical opinions. "Where, [] the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (internal citations and quotation omitted).

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole); *Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds for remand.).

Furthermore, the burden to provide evidence to establish the RFC lies with Plaintiff—not the Commissioner. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) ("The applicant bears the burden of proof in the first four steps of the sequential inquiry . . . ."); *Mitchell v. Colvin*, No. 14-CV-303S, 2015 WL 3970996, at *4 (W.D.N.Y. June 30, 2015) ("It is, however, Plaintiff's burden to prove his RFC."); *Poupore v. Astrue*, 566 F.3d 303, 305-06 (2d Cir. 2009) (The burden is on Plaintiff to show that she cannot perform the RFC as found by the ALJ.).

Contrary to Plaintiff's arguments, ALJ Bell thoroughly analyzed the opinion evidence and the other evidence of record in accordance with the applicable regulations when developing Plaintiff's RFC, and substantial evidence supports the ALJ's finding that Plaintiff retained the RFC to perform sedentary work with additional limitations. Tr. 1873. *See* 20 C.F.R. §§ 404.1527, 416.927.

Plaintiff first argues that remand is warranted because the ALJ did not provide good reasons for according "little weight" to Dr. Fendya's December 28, 2016 treating source opinion and "some weight" to her October 4, 2021 hearing testimony. *See* ECF No. 6-1 at 14-20. For claims

filed prior to March 27, 2017,[5] the opinions of Plaintiff's treating physicians should be given "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2). An ALJ is required to consider several factors in determining how much weight an opinion should receive, including the length of the relationship and frequency of examinations, nature of the relationship, medical evidence that supports the opinion, consistency with the record, and if the physician's specialty is relevant to the impairment. *Burgess v. Astrue*, 537 F. 3d 117, 129 (2d Cir. 2008).

If the ALJ gives the treating physician's opinion less than controlling weight, he must provide good reasons for doing so. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998); *see also Schaal v. Apfel*, 134 F. 3d 496, 503-504 (2d Cir. 1998). Good reasons for not assigning treating source opinion controlling weight are shown through express consideration of these factors, although a "searching review of the record" can also demonstrate good reasons for the weight given the opinion that does not traverse the treating source rule. *See Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). In addition, a treating source opinion cannot be entitled to controlling weight if it is not consistent with the source's own treatment notes or with other substantial evidence. *See Halloran*, 362 F.2d at 31-32 (citing *Veino*, 312 F.3d at 588); *Cichocki v. Astrue*, 729 F. App'x 71, 77 (2d Cir. 2013).

Contrary to Plaintiff's arguments, ALJ Bell provided good reasons for giving little weight to Dr. Fendya's December 2016 opinion and properly addressed the *Burgess* factors in doing so. Tr. 1879, 2115-20. *See Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019) (citing *Burgess*, 537

---

[5] New regulations regarding the evaluation of medical evidence and rescission of Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-03p, took effect on March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017). Because Plaintiff's DIB claim was filed on January 8, 2014, and her SSI claim on June 20, 2016, the previous regulations are applicable to her claims.
.

F.3d at 128). ALJ Bell noted that Dr. Fendya was Plaintiff's treating psychologist and had treated Plaintiff since 2002. Tr. 1876. ALJ Bell also summarized treatment notes from Dr. Fendya indicating that Plaintiff's symptoms were the result of her physical impairment and that her depression was not disabling, possibly due to the effectiveness of treatment. 1872, 1876, 1878-79, 1482-94, 1558-91, 1896. *See* 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), (5), 416.927(c)(2)(i)-(ii), (5) (listing as factors for the ALJ to consider: nature, extent, and length of treatment relationship, frequency of examination, and medical source specialty).

ALJ Bell also noted that Dr. Fendya's December 2016 opinion was "confusing and internally inconsistent in a number of respects." Tr. 1879. *See* 20 C.F.R. §§ 404.1527(c)(3); 416.927(c)(3) (The better an explanation a source provides for a medical opinion, the more weight an adjudicator will give that medical opinion); (c)(4) (Generally, the more consistent a medical opinion is with the record as a whole, the more weight and adjudicator will give to that medical opinion). For example, ALJ Bell noted that Dr. Fendya's opinion that Plaintiff would be absent from work three to four days per month and her comment that Plaintiff's pain and mental impairments feed off of each other, but ALJ Bell also noted that Dr. Fendya's assessment of moderate restriction of activities of daily living; moderate difficulties maintaining concentration, persistence or pace; marked difficulties maintaining social functioning; and no indication of any episodes of decompensation "is not consistent with that opined rate of absenteeism and the acknowledgment that [Plaintiff's] physical impairments contributed to her functional limitations." Tr. 1879, 2119.

Notably, moderate mental limitations in activities of daily living and in concentration, persistence or pace, are not disabling, nor do they preclude an RFC for simple, routine and repetitive tasks with the ability to make simple work-related decisions, such as the ALJ found here. Tr. 1873. *See Syble L. v. Comm'r of Soc. Sec.*, No. 19-CV-00434, 2021 WL 1175981, at *6

(W.D.N.Y. Mar. 29, 2021) ("[a] finding of moderate limitations in mental functioning does not preclude the ability to perform unskilled work."); *Rivas v. Berryhill*, No. 1:17-CV-05143, 2018 WL 4666076, at *15 (S.D.N.Y. Sept. 27, 2018) ("The Second Circuit has repeatedly held that 'moderate' limitations [in concentration, persistence, and pace] do not preclude an individual's ability to perform unskilled work.") (collecting cases); *Landers v. Colvin*, No. 14-CV-1090, 2016 WL 1211283, at *4 (W.D.N.Y. Mar. 29, 2016) ("The determination that Plaintiff is limited to 'simple, repetitive, and routine tasks' accounts for Plaintiff's [moderate] limitations as to maintaining attention and concentration, performing activities within a schedule, and maintaining regular attendance.").

ALJ Bell also noted that Dr. Fendya's December 2016 opinion was inconsistent with her June 2005 opinion that Plaintiff's depression was "consequential" to her May 2002 accident and subsequent surgeries; that her work-related disability was solely due to her physical injury; and that she was not psychologically disabled. Tr. 1876, 1879, 1217 1394. ALJ Bell further noted that there was no intervening medical evidence in the record to account for the disparity between these two assessments. Tr. 1879.

Finally, ALJ Bell noted that elements of Dr. Fendya's December 2016 opinion were "clearly not consistent with the evidence," including, for example, Dr. Fendya's conclusion that Plaintiff had a marked impairment in social functioning, which was at odds with Plaintiff's reports of her plans to travel to Disneyland for a friend's wedding and attend Mardi Gras in New Orleans, or the fact that she attended college (in-person), and worked part-time for 12 to 16 hours per week. Tr. 1879, 484, 1139-41, 1241, 1879. *See* 20 C.F.R. §§ 404.1571, 416.971 ("Even if the work you have done [during a period of claimed disability] was not substantial gainful activity, it may show that you are able to do more work than you actually did."); *see also Silva v. Saul*, No. 18-CV-6206, 2019 WL 2569595, at *5 (W.D.N.Y. June 21, 2019) (collecting cases) (explaining that an "ALJ

may also properly consider a claimant's demonstrated ability to work part-time during the relevant period as evidence that the claimant is not completely disabled").

In any event, a marked limitation in social functioning is not necessarily disabling. *See e.g.*, *Kya M. v. Comm'r of Soc. Sec.*, 506 F. Supp. 3d 159, 166–67 (W.D.N.Y. 2020) (noting that marked limitations in mental functioning "do not mandate a finding of disability, but can be addressed with additional limitations to a plaintiff's RFC, such as limiting plaintiff to simple, routine and repetitive tasks in a work environment free to fast-paced production requirements"); *Davis v. Comm'r of Soc. Sec.*, No. 17-cv-6804, 2019 WL 1870814, at *3, (W.D.N.Y. Apr. 26, 2019) ("'[M]arked' limitations do not necessarily constitute an inability to perform work.").

Despite Plaintiff's admonishment that "the ALJ believes missing 3 to 4 days of work per month is not consistent with having marked limitations in social functioning and moderate limitations in activities of daily living and maintaining concentration, persistence or pace" (*see* ECF No. 6-1 at 17), the ALJ reasonably found that the record did not support marked social limitations as opined by Dr. Fendya, and moderate mental limitations are not disabling, as explained above. Additionally, it is within the ALJ's discretion to resolve genuine conflicts in the evidence. *See Veino*, 312 F.3d at 588; *see also Barry v. Colvin*, 606 F. App'x 621, 623-24 (2d Cir. 2015) ("Barry points to an 'uncontradicted' medical source statement . . . that Barry could not maintain a regular schedule . . . . [The] opinion . . . did not bind the ALJ, who was entitled to exercise discretion in reviewing the record evidence in its totality . . . ."). Therefore, it was within ALJ Bell's discretion to reject Dr. Fendya's unsupported opinion that Plaintiff would miss three to four days of work per month. Tr. 1879.

ALJ Bell similarly provided good reasons for according only "some weight" to Dr. Fendya's October 4, 2021 hearing testimony. Tr. 1879. Dr. Fendya testified that Plaintiff's mental impairments were of listing-level in severity by virtue of markedly limited social functioning, at

least at times, as well as a marked limitation in the ability to adapt or manage herself. Tr. 1897-99. As with her December 2016 opinion, ALJ Bell found Dr. Fendya's opinion that Plaintiff at times had a marked limitation in social functioning not supported by the record. Tr. 1879, 484, 1139-41, 1241, 1879. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

ALJ Bell also noted Dr. Fendya's inability to provide any specific examples of Plaintiff's inability to function in a work setting and, instead, gave very vague descriptions of Plaintiff's "budget" for energy and activity. Tr. 1879-80, 1900-01. As noted above, Dr. Fendya testified that Plaintiff needed to "budget" her mental, emotional, and physical ability to perform a particular activity, and throughout her testimony, she referred to Plaintiff's need to manage this "budget" by "figuring out the best combination of things," such as various medication combinations." Tr. 1900-01, 1906-07. Dr. Fendya also discussed Plaintiff's ability to better manage her "budget" through the use of "psychotherapy and other supports." Tr. 1910-11.

ALJ Bell also noted that Dr. Fendya explained her June 2005 opinion that Plaintiff did not have a disabling mental impairment as trying to make it clear to the Worker's Compensation Board that Plaintiff's disabilities were based on her physical work-related injury. Tr. 1879, 1907-08, 1217. However, ALJ Bell reasonably concluded that Dr. Fendya's 2005 statement that Plaintiff was never disabled from mental impairments contradicted her 2021 hearing testimony that Plaintiff had a mental impairment of listing-level severity. Tr. 1880. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). ALJ Bell also noted the portion of Dr. Fendya's testimony that focused on Plaintiff's desire to work in glassblowing, wherein Dr. Fendya opined that "if [Plaintiff] wasn't disabled, this is what she would be doing with her life." Tr. 1880, 1910. However, as ALJ Bell aptly noted, Plaintiff never tried to pursue any less physically demanding occupations. Tr. 1880.

Contrary to Plaintiff's argument (*see* ECF No. 6 st 17-18), ALJ Bell also permissibly considered Plaintiff's daily activities in discounting Dr. Fendya's opinion. Tr. 1880. *See* 20 C.F.R.

§ 404.1529(c)(3)(i) (An ALJ may consider the nature of a claimant's daily activities in evaluating the consistency of allegations of disability with the record as a whole.); *see also Ewing v. Comm'r of Soc. Sec.*, No. 17-CV-68S, 2018 WL 6060484, at *5 (W.D.N.Y. Nov. 20, 2018) ("Indeed, the Commissioner's regulations expressly identify 'daily activities' as a factor the ALJ should consider in evaluating the intensity and persistence of a claimant's symptoms.") (citing 20 C.F.R. § 416.929(c)(3)(i)). As ALJ Bell noted, during the relevant period, Plaintiff was able to care for her ill parents, attend school, travel, and reliably make and attend medical appointments, which undermined Dr. Fendya's opinion that Plaintiff was disabled. Tr. 1880, 484, 1139-41, 1241, 1879. *See Abarzua v. Berryhill*, 754 F. App'x 70, 71 (2d Cir. 2019) (ALJ did not err in observing that treating physician's opinion was contradicted by plaintiff's activities of daily living, among other factors); *see also Cichocki v. Astrue*, 729 F.3d 172, 178 (2d Cir. 2013) (holding that Plaintiff's activities of daily living were an important indicator of her true level of both physical and mental functioning); *Susan M. F. v. Comm'r of Soc. Sec.*, No. 1:20-CV-1073, 2021 WL 2268825, at *6 (W.D.N.Y. June 3, 2021) ("the ALJ also properly relied on Plaintiff's ability to perform activities of daily living which supported the ALJ's RFC finding).

Based on the foregoing, ALJ Bell provided "good reasons" for assigning little weight to Dr. Fendya's December 2016 opinion and some weight to her October 2021 testimony. Tr. 1879-80. Based on the record, ALJ Bell reasonably concluded that, while Dr. Fendya's testimony was consistent with the presence of a severe mental impairment resulting in some work-related mental limitations, Plaintiff's limitations were not of disabling severity. Tr. 1880. ALJ Bell also reasonably concluded that, contrary to Dr. Fendya's testimony, Plaintiff could have worked in a sedentary job with some additional limitations, including the mental limitations included in the RFC. *Id*. Accordingly, the Court finds no error in ALJ Bell's mental RFC finding, which limited Plaintiff to simple, routine, and repetitive tasks with simple work-related decisions.

Plaintiff also complains that ALJ Bell did not discuss all of Dr. Fendya's letters to the Workers Compensation Board, only mentioning Dr. Fendya's June 29, 2005 letter. *See* ECF No. 6-1 at 17-18. In addition to the June 2005 letter, the record reflects that Dr. Fendya wrote letters to the Workers Compensation Board on April 8, 2003 (Tr. 1259), October 17, 2003 (Tr. 1493-94), December 12, 2003 (Tr. 1482), and May 17, 2016 (Tr. 857). Contrary to Plaintiff's argument, however, "'an ALJ does not have to state on the record every reason justifying a decision,' nor is an ALJ 'required to discuss every piece of evidence submitted.'" *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (summary order) (quoting *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012)). Thus, ALJ Bell was not required to explicitly reference each of Dr. Fendya's letters.

In any event, these letters do not shed light on Plaintiff's mental ability to perform work-related activities during the relevant period because Dr. Fendya made no mention of Plaintiff's abilities. Tr. 1259, 1482, 1493-94. *See* 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1) (Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.). Furthermore, to the extent Plaintiff construes Dr. Fendya's letters as opining that Plaintiff was disabled, such an opinion is never entitled to any significant weight. *See* 20 C.F.R. § 404.1527(d) (an opinion on the ultimate issue of disability is not a medical opinion, and is not entitled to any "special significance"); *see also Robson v. Astrue*, 526 F.3d 389, 393 (8th Cir. 2008); *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination.").

Plaintiff also argues that because ALJ Bell did not accord controlling weight to any medical opinion and did not properly weigh the opinions of Dr. Miller and Dr. Brothman, her RFC finding was not supported by substantial evidence because. *See* ECF No. 6-1 at 23-26. However, as explained above, RFC is an administrative finding, not a medical one. *See* 20 C.F.R. §§ 404.1520b(c)(3)(iii), 404.1546(c), 416.920b(c)(3)(iii), 416.946(c); *Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d Cir. 2022). Ultimately, an ALJ is tasked with weighing the evidence in the record and reaching an RFC finding based on the record. *See Tricarico v. Colvin*, 681 F. App'x 98, 101 (2d Cir. 2017) (citing *Matta*, 508 F. App'x at 56) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."); *see also Schillo*, 31 F.4th at 78 ("[A]n ALJ's conclusion need not perfectly correspond with any of the opinions of medical sources cited in his decision, because the ALJ is entitled to weigh all of the evidence available to make a residual functional capacity finding that [is] consistent with the record as a whole.") (internal citations and quotations omitted).

Moreover, an ALJ does not necessarily "reject" opinion evidence when the opinion is assessed less than controlling weight and where, it is evident that the ALJ's RFC determination incorporates limitations contained in that opinion. *See, e.g.*, *Cottrell v. Comm'r of Soc. Sec.*, 2019 WL 201508, *3 (W.D.N.Y. 2019) ("[c]ontrary to [claimant's] assertion, the ALJ did not wholly reject [the doctors'] opinions; instead, she afforded them 'partial' and 'some' weight and ... relied on portions of them to determine [claimant's] RFC[;] ... [j]ust because the ALJ did not afford either [doctor's] opinion controlling weight does not mean that she substituted her own view of the medical evidence for those opinions"); *see also Harris v. Berryhill*, 2017 WL 4112022, *3 (W.D.N.Y. 2017) ("[p]laintiff contends that the ALJ improperly 'rejected' [doctors'] opinions [which the ALJ afforded 'less than significant weight'] without citing to another medical opinion[;]

[p]laintiff overstates the ALJ's actions[;] [t]he ALJ did not 'reject' these opinions[;] [t]o the contrary, he gave them some weight and incorporated certain of the limitations set forth therein into his RFC finding");

Here, ALJ Bell considered the objective medical and opinion evidence of record in formulating the physical RFC for sedentary work with postural limitations. Tr. 1873-80. First, ALJ Bell noted that Plaintiff had a history of chronic left knee problems requiring surgical intervention in the 1990s and early 2000s. Tr. 1875, 1682-1846. For example, ALJ Bell noted that an IME conducted by orthopedic surgeon Dr. Brothman in January 2003 revealed that Plaintiff had a limping gait; was unable to perform a full squat; her range of motion was from zero degrees to 110 degrees; and there was no evidence of crepitus or tenderness to patellar compression. Tr. 1875, 1285. Dr. Brothman observed that Plaintiff's patella was stable, although somewhat hypermobile and muscle atrophy was noted in the left thigh. *Id*. Dr. Brothman assessed recurrent dislocations of the left patella and was status post-surgery with post-operative quadriceps atrophy. Tr. 1875, 1286, 1682-83. When reexamined in April 2004, Plaintiff continued to exhibit a limping gait and complained of an inability to squat. Tr. 1875, 1233. However, Plaintiff had full range of motion and displayed some tenderness to patellar compression and some crepitus, but there was no ligamentous instability. Tr. 1875, 1234.

ALJ Bell also noted that during a June 2005 examination, treating orthopedist Dr. Smolinski noted that Plaintiff's gait was slightly asymmetric; she exhibited mild crepitus; no joint effusion; neutral tilt; and full range of motion. Tr. 1875, 1215-16. He regarded Plaintiff's left knee as clinically stable. *Id*. However, in November 2006, Dr. Smolinski noted that Plaintiff experienced recurrent patellar subluxation and recommended quadriceps exercises and noted that further surgery, specifically medial retinacular reconstruction, might become necessary. Tr. 1875, 1207. In July 2008, Dr. Smolinski observed that Plaintiff ambulated "with a basically normal gait"

26

and had full range of motion of the left knee. Tr. 1875, 1209. He opined that Plaintiff was not a candidate for further surgical procedures. Tr. 1875, 1209-10.

ALJ Bell also noted that Dr. Miller conducted IMEs in May 2008 and February 2009. Tr. 1875, 1146-48, 1152-55. On both occasions, Dr. Miller observed that Plaintiff ambulated with a normal gait; motion in the left knee ranged from zero degrees to 140 degrees and the patella tracked laterally; and there was no evidence of dislocation or subluxation on range of motion. Tr. 1875, 1147, 1153. Pain was reported on patellofemoral grind testing; apprehension testing was positive, but Plaintiff's ligaments were stable, and she displayed no thigh atrophy. Tr. 1875-76, 1147. Anterior and drawer signs were negative. *Id*. In May 2008, Dr. Miller recommended six weeks of physical therapy, and in February 2009, he opined that Plaintiff had attained maximum medical improvement from physical therapy and recommended she continue to undergo pain management treatment. Tr. 1876, 1146, 1154.

ALJ Bell next considered the objective findings of pain management specialist Dr. Peer. Tr. 1876. When examined in November 2004, Plaintiff had a markedly antalgic gait, full strength in the lower extremities bilaterally, and intact sensation and reflexes. Tr. 1876, 1228. In June 2009, Dr. Peer stated that Plaintiff obtained significant relief with the use of the TENS unit. Tr. 1876, 1123. Plaintiff walked without crutches and reported she was able to walk one mile. Tr. 1876, 1123-24. In January 2013, Plaintiff 's medications included Motrin, Norco, and the occasional use of Darvocet, and she was no longer using a TENS unit because the electrode patches were not covered by her insurance carrier. Tr. 1876, 479. When seen in February 2013, Dr. Peer observed that Plaintiff's gait was normal, and she reported that she was a full-time student and worked 12 to 16 hours per week. Tr. 1876, 484. In August 2013, Dr. Peer observed that Plaintiff's gait was normal, as was her ability to walk on her heels and toes. Tr. 1876, 505. In May 2014, he noted that Plaintiff walked with a normal gait and displayed full (5/5) strength, bilaterally. Tr. 1876, 556. He

further noted that Plaintiff had a normal ability to walk on her heels and toes. *Id*. In April 2016, Plaintiff's gait remained normal, as did her strength, sensation, and reflexes in the lower extremities. Tr. 1876, 684. Dr. Peer prescribed a series of sub patellar cortisone injections and bracing, which were helpful in relieving symptoms. Tr. 1876, 479-838.

In addition to the objective medical evidence, ALJ Bell considered the medical opinion evidence. ALJ Bell specifically observed that Dr. Smolinski concluded in March 2004 that Plaintiff could work in a "basic sedentary type occupation" (Tr. 1453), and as of November 2, 2006, Dr. Smolinski reported that Plaintiff was presently working after returning to work on October 27, 2006 (Tr. 1207). Tr. 1877. On March 29, 2007, Dr. Smolinksi released Plaintiff to return to light duty work. Tr. 1877, 1205. In August 2008, Dr. Smolinski opined that Plaintiff was able to return to her retail position in September 2008, but was limited to working four hours per day. Tr. 1877. 1158.

In May 2008, Dr. Miller determined that Plaintiff was able to return to full-time work with a lifting restriction of 15 to 25 pounds. Tr. 1877, 1154. Dr. Miller noted that Plaintiff was working 16 hours per week, attending college, and working as a full-time caregiver to her parents. Tr. 1876, 1140. In February 2009, Dr. Miller noted Plaintiff walked with a normal gait and continued to work 16 hours per week and was a full-time care giver to her parents. Tr. 1877, 1147. In late 2009, Dr. Peer opined that Plaintiff was able to return to work with limitations. Tr. 1877, 1108.

In January 2003, Dr. Brothman noted that Plaintiff had a marked degree of disability, but he opined that she could work and required a job that was sedentary in nature. Tr. 1878, 1286, 1684. Dr. Brothman added that Plaintiff had difficulty with walking, squatting, and climbing. *Id*. In April 2004, he opined that Plaintiff was able to work a part-time desk job provided she avoided stairs, squatting and climbing. Tr. 1878, 1234. He also noted that Plaintiff was a full-time student at the time. Tr. 1878, 1233, 1448. Finally, ALJ Bell noted that Plaintiff's primary care provider,

David Pawlowski, M.D. ("Dr. Pawlowski"), opined on May 4, 2010, that Plaintiff had a temporary 100% impairment. Tr. 1878, 1089. However, Dr. Pawlowski also opined that Plaintiff "needs a job that does not require her to be on her feet." Tr. 1878, 1089.

Based on the foregoing, the opinions of Drs. Smolinski, Miller, Peer, Brothman, and Pawlowski are consistent with ALJ Bell's RFC finding for sedentary work with postural limitations. Tr. 1873. Plaintiff has failed to prove that her RFC should have been more restrictive, as was her burden. *See Poupore*, 566 F.3d at 306.

Contrary to Plaintiff's claim that ALJ Bell did not weigh the opinions of Drs. Brothman or Miller (*see* ECF No. 6-1 at 23-26), ALJ Bell's decision indicates that she assigned all of these opinions significant weight because they were consistent with the objective evidence and with each other. Tr. 1878. Plaintiff's argument that Dr. Brothman's 2003 opinion that Plaintiff could work a sedentary job was stale (*see* ECF No. 6-1 at 26) is unavailing as the opinion was rendered during the relevant period. *See Andrews v. Berryhill*, 2018 WL 2088064, at *3 (W.D.N.Y. May 4, 2018) (noting that an opinion rendered during the relevant period was not stale). Plaintiff's suggestion that Dr. Brothman's 2014 opinion that Plaintiff could return to work part-time at a desk job meant that she was unable to engage in substantial gainful activity is similarly unavailing. *See* ECF No. 6-1 at 25. As discussed above, ALJ Bell relied on substantial other evidence in addition to Dr. Brothman's opinions to support her RFC finding, including Dr. Miller's 2008 opinion that Plaintiff was able to return to full-time work with a 15-to-25-pound lifting restriction. Tr. 1154. As ALJ Bell observed, while the treating and examining source opinions varied somewhat in their degree of specificity, they were all consistent with the ability to perform at least a range of sedentary work, as well as consistent with Plaintiff's own reporting of her activities. Tr. 1878.

Plaintiff also argues that the ALJ erred when she did not evaluate whether a cane was medically required. *See* ECF No. 6-1 at 27-28. However, the record does not demonstrate that

Plaintiff's use of a cane was medically required throughout the relevant period. As the ALJ noted, Plaintiff testified that she had a cane since 2008, but she needed it only intermittently, such as after a surgery or injury. Tr. 1874, 1096, 1917-20, 1923, 1926. Furthermore, in August 2008, Plaintiff told Dr. Smolinski that she used a cane only sporadically. Tr. 1158. Although Plaintiff points to several instances in the record where she was observed to use a cane (*see* ECF No. 6-1 at 27-28), these examples further establish that Plaintiff used a cane only intermittently and typically following a knee surgery or injury. *See, e.g.*, Tr. 1817, 1821, 1823, 1825, 1827, 1829, 1831, 1833, 1607, 1703, 1707, 1795, 1683-84. Although Dr. Peer indicated on a November 3, 2015 check-box form that Plaintiff required a cane (Tr. 653), during a physical examination on the same date, Dr. Peer observed that Plaintiff's gait and her ability to heel-toe walk were normal (Tr. 652). In April 2016, Plaintiff's gait remained normal, as did her strength, sensation, and reflexes in the lower extremities. Tr. 684. Based on the foregoing, the overall evidence does not substantiate Plaintiff's allegation that a cane was medically required.

Because ALJ Bell reasonably formulated Plaintiff's RFC for a range of simple, sedentary work with postural limitations the RFC finding based on objective medical findings and the opinion evidence, as well as Plaintiff's testimony and reported activities of daily living, the Court finds no error. Tr. 1873-80.

Plaintiff next argues that ALJ Bell erred in not complying with the requirements of SSR 18-1p in determining the onset date of Plaintiff's disability. *See* ECF No. 6-1 at 22-23. Plaintiff's argument is unpersuasive. SSR 18-1p governs the determination of disability onset dates. *See* SSR 18-1p Determining the Established Onset Date (EOD) in Disability Claims, 2018 WL 4945639 (S.S.A. Oct. 2, 2018). SSR 18-1p addresses how SSA determines the EOD in claims that involve traumatic, non-traumatic and exacerbating and remitting impairments. SSR 18-1p goes on to note that if SSA finds that a claimant meets the statutory definition of disability and meets the applicable

non-medical requirements during the period covered by his or her application, then it determines the claimant's EOD. *See id.*

As noted above, Plaintiff filed her present DIB and SSI claims on January 8, 2014, and June 20, 2016, respectively, alleging disability beginning May 13, 2002. Transcript ("Tr.") 198-199, 327-333. Plaintiff filed a subsequent application for SSI benefits on June 13, 2018, and after an administrative hearing, ALJ Singh found Plaintiff disabled as of June 13, 2018, the application date for that claim. Tr. 1868; *see also* ECF No. 6-2. In the present case, ALJ Bell found that Plaintiff was not disabled from May 13, 2002, the alleged disability onset date, through June 12, 2018. Tr. 1881. Plaintiff argues that because "June 13, 2018 is not a medically determinable date, but rather an arbitrary date based on the date Plaintiff filed her subsequent application," ALJ Bell "should have been looking for evidence to support an onset date consistent with the medical evidence of record." *See* ECF No. 6-1 at 22-23.

As the Court has already determined, ALJ Bell properly found that Plaintiff did not meet the statutory definition of disability for the period at issue in the present case, *i.e.*, Plaintiff's May 2002 alleged onset date through June 12, 2018, the date of ALJ Bell's decision. Thus, Plaintiff's argument that the finding in her subsequent application should have some bearing on the claim before this Court is baseless. Under 42 U.S.C. § 405(g), this Court's review is limited to the Commissioner's June 12, 2018 decision, and not ALJ Singh's December 9, 2019 decision that was based on Plaintiff's subsequent SSI application. *See* 20 C.F.R. § 404.620 (a DIB application remains in effect only until the ALJ's decision issued); 20 C.F.R. § 416.335 (SSI benefits are not payable for any month prior to the month in which the application for such benefits was filed); *see also Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 486, n.1 (2d Cir. 2012). Furthermore, a subsequent agency decision is not itself "evidence" of disability. *See Caron v. Colvin*, 600 Fed. App'x 43 (2d Cir. 2015) (Summary Order) (a subsequent disability finding "is not itself evidence

of disability but, rather, a conclusion based on evidence."); *Barnaby v. Berryhill*, 773 F. App'x 642, 644 (2d Cir. 2019) (finding that a later determination, on its own, is neither evidence of disability nor support for a claim that the ALJ's decision was unsupported by substantial evidence).

Finally, because substantial evidence supports the Commissioner's decision that Plaintiff was not disabled from May 2002 through June 12, 2018, there is no merit to Plaintiff's argument that she is entitled to SSI and DIB benefits dating back to May 2002 based on the number of years that have elapsed since she applied for benefits. *See* ECF No. 6-1 at 29. "[A]bsent a finding that the claimant was actually disabled, delay alone is an insufficient basis on which to remand for benefits." *Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996); *accord Allord v. Astrue*, 631 F.3d 411, 417 (7th Cir. 2011) ("a court does not have the authority to award disability benefits on grounds other than those provided under 42 U.S.C. § 423."); *Gilliland v. Heckler*, 786 F.2d 178, 184 (3d Cir. 1986) (decision to reverse and direct an award of benefits "should be made only when . . . substantial evidence on the record as a whole indicates that the Claimant is disabled and entitled to benefits").

As previously noted, Plaintiff bears the ultimate burden of proving that she was more limited than the ALJ found. *See Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) ("Smith had a duty to prove a more restrictive RFC, and failed to do so."); *Poupore*, 566 F.3d at 306 (it remains at all times the claimant's burden to demonstrate functional limitations, and never the ALJ's burden to disprove them). While Plaintiff may disagree with the ALJ's conclusion, Plaintiff's burden was to show that no reasonable mind could have agreed with the ALJ's conclusions, which she has failed to do.

Based on the foregoing, substantial evidence in the record supports the ALJ's RFC finding. When "there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Davila-Marrero v. Apfel*, 4 F. App'x 45, 46 (2d Cir. Feb. 15, 2001) (citing

*Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)). While Plaintiff may disagree with the ALJ's conclusion, Plaintiff's burden was to show that no reasonable mind could have agreed with the ALJ's conclusions, which she has failed to do. The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude* otherwise." *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original). As the Supreme Court explained in *Biestek v. Berryhill*, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

## CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 6) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 7) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE